S. Martin Keleti (Bar # 144208)
KELETI LAW
E-mail: s.martin.keleti@gmail.com
9903 Santa Monica Boulevard, Suite 751
Beverly Hills, CA 90212-1671
Telephone: 323.308.8489

*Counsel for Plaintiffs and the Proposed Class*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA HADI and JUN IMAIZUMI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION, a Japanese corporation;<br>TOYOTA MOTOR NORTH AMERICA, INC., a California corporation; and<br>TOYOTA MOTOR SALES, U.S.A., INC., a California corporation;<br><br>Defendants. | Case No.: 2:23-CV-9613<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **Breach of Express Warranty;**<br>2. **Breach of Express Warranty—Magnuson-Moss Warranty Act;**<br>3. **Breach Of Implied Warranty;**<br>4. **Breach of Implied Warranty—Magnuson-Moss Warranty Act;**<br>5. **Violations of NJCFA;**<br>6. **Violations of FDUTPA;**<br>7. **Fraud by Concealment;**<br>8. **Quasi Contract**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs individually for themselves and on behalf of all persons who purchased or leased certain vehicles equipped with a uniformly defective air conditioner evaporator drain ("AC evaporator drain") design (the "Defect") allege:

## SUBJECT MATTER AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiffs and Class Members are citizens of a state different than Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331

because Plaintiffs' Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because certain Defendants are incorporated in this District and State and are "at home" in this District, Defendants are residents of this District pursuant to 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

3.      The Defect is a defectively designed component, namely, the air AC Evaporator drain for various vehicles designed, manufactured, distributed, warranted, marketed, sold, and leased by Defendants under the brand name LEXUS, including the 2015-2022 LEXUS CT 200h, LEXUS Es 350, LEXUS Es 300h, LEXUS GX 460, LEXUS HS 250h, LEXUS LFA, LEXUS LS 460, LEXUS LS 600hL, LEXUS RX 350/450h, LEXUS RX 350 (NAP) (collectively, the "Class Vehicles").[1]

4.      This action is brought to remedy violations of law in connection with Defendants' design, manufacture, marketing, advertising, selling, warranting, and servicing of the Class Vehicles. The Class Vehicles' Defect makes the AC evaporator drain susceptible to blockages. Both the design and materials' deficiencies of the AC evaporator drain make it highly susceptible to damaging blockages caused by spider webs and other insect structures. The blockages prevent the water associated with a Class Vehicle's air conditioning system from draining outside the vehicle, thus causing the water to drain inside the passenger compartment. This passenger compartment leakage causes further complications including: (a) an accumulation of mold and mildew residue within the passenger compartment including on seats and in carpeting; (b) an odor within the passenger compartment that impedes on the comfort and enjoyment of the Class Vehicle; and (c) making the Class Vehicle's passenger

---

[1] Discovery will enable Plaintiffs to more precisely determine which model-years sharing the same uniform Defect.

compartment unusable for its intended purpose.

5.     Plaintiffs are informed and believe that the Defect's component is substantially the same from a mechanical engineering standpoint in all Class Vehicles.

6.     The Defect is the result of both faulty design and improper materials and manufacturing.

7.     In part, because of the faulty design, the AC evaporator drain is easily susceptible to blockages from spider webs and similar foreseeable blocking issues that regularly occur. These blockages cause the AC evaporator drain to fail in properly draining water in relation to Class Vehicle's air conditioning system. This failure leads the water to drain inside of the passenger compartment of Class Vehicles. The water creates damage and a moist, hospitable environment for the growth of bacteria, fungus, mold, and spores, which then are blown into the passenger compartment. This causes the air to have a foul, mildewy smell that is highly unpleasant and can cause respiratory problems and aggravate allergies.

8.     The Defect is the result of improper and defective materials. For example, after Plaintiffs and Class Members complained to Defendants about the Defect, Defendants only then disclosed a materials-based solution—an evaporator drain hose with an insecticide tip—that could have easily been installed during manufacture and prevented interior damage caused by the Defect. Worse yet, Defendants make Class Members pay out-of-pocket for the hose tipped evaporator drain and the damage caused by the Defect even if Class Members' vehicles remained under warranty at the time.

9.     The Defect inhibits Class Members' proper and comfortable use of their Class Vehicles and requires Class Members to pay for repeated temporary repair services for the AC evaporator drain due to the ongoing issues it has caused.

10.    Prior to the manufacture and sale of the Class Vehicles, Defendants knew of the Defect through sources available to Defendants, as demonstrated by the multiple Technical Service Bulletins prepared by Defendants and issued by them to

their authorized dealers; field inspections conducted by Defendants; warranty requests made by Class Vehicle purchasers and lessees; consumer complaints posted on public online vehicle owner forums and social media; previous recalls; and other internal sources unavailable to Plaintiffs without discovery. Yet despite their knowledge, Defendants failed to disclose and actively concealed the Defect from Class Members.

11.    Defendants knew or should have known that the "solutions" they charged Class Members for were simple fixes that should have been made by Defendants pre-purchase or at the very least, Defendants should have revealed the defect to Class Members, who then could have paid for the fixes and prevented the more extensive damage the Defect causes within the passenger compartments of Class Vehicles, for which Defendants force Class Members to pay.

12.    Defendants failed to fix the Defect either preemptively by a materials fix or by providing a repair and fix under warranty fix for the Defect and have failed to reimburse Class Members for the costs associated with the Defect.

13.    As a result of Defendants' misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, in that the Class Vehicles have manifested, and continue to manifest, the Defect, and Defendants have not provided a permanent remedy for their Defect. Furthermore, Plaintiffs and Class Members incurred, and will continue to incur, out-of-pocket unreimbursed costs and expenses relating to the Defect.

## PARTIES

### Plaintiff Sara Hadi

14.    Plaintiff Sara Hadi ("Hadi") is a resident and citizen of Bergen County, State of New Jersey.

15.    Hadi owns a 2022 LEXUS RX SUV, which was purchased new in July of 2022, from a local dealership in New Jersey.

16.    Hadi's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Defendants.

17.    Hadi purchased the Class Vehicle for her personal, family, and household use.

18.    Hadi expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that her vehicle's evaporator drain was susceptible to these blockages, nor was she aware from any source prior to purchase of the unexpected, extraordinary, and costly maintenance steps Defendants suggest are necessary to prevent the development of mold. Had she known these facts, she would not have bought her Class Vehicle or would have paid substantially less for it.

19.    Hadi first experienced water in her passenger compartment on July 16, 2023, just under a year from when she purchased the vehicle on July 21, 2022.

20.    Hadi was informed by the authorized dealer from whom she purchased her Class Vehicle that the blockage was the result of the improper design and materials used, and that had proper materials such as an AC evaporator drain hose with an insecticide tip (commonly known as an ARINIX® Tip) been used, the issue would not have occurred. Hadi is informed and believes that the ARINIX® Tip part costs approximately $30.

21.    However, as a result of the Defect, Hadi has suffered significant ascertainable loss, as she was quoted a price of approximately $8,000 to remedy the flooded passenger compartment interior water damage caused by the Defect. Although Hadi's automobile insurance company covered a portion of the cost, Hadi was required to pay $500 as the deductible portion.

22.    Hadi regularly saw advertisements for LEXUS vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before she purchased her LEXUS RX SUV in 2022. Had those advertisements or any other LEXUS materials disclosed to Hadi that the Class Vehicles had a defective AC evaporator drain, or that she would have to pay for repairs/replacement of the AC evaporator drain, she would not have purchased her Class Vehicle, or would have paid

substantially less for it.

**Plaintiff Jun Imaizumi**

23.    Plaintiff Jun Imaizumi ("Imaizumi") is currently a resident and citizen of Nassau County, State of New York, and formerly a resident and citizen of Hillsborough County, State of Florida.

24.    Imaizumi owns a 2020 LEXUS RX SUV, which was purchased new in February of 2020, from a LEXUS dealership in Tampa, Florida.

25.    Imaizumi's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Defendants.

26.    Imaizumi purchased the Class Vehicle for his personal, family, and household use.

27.    Imaizumi expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that his vehicle's AC evaporator drain was susceptible to blockages described in this complaint, nor was he aware from any source prior to purchase of the unexpected, extraordinary, and costly maintenance steps Defendants suggest are necessary to prevent the development of mold. Had Imaizumi known these facts, he would not have bought his Class Vehicle or would have paid substantially less for it.

28.    Imaizumi first experienced water in his Class Vehicle's passenger compartment in September of 2023.

29.    Imaizumi was informed by the local authorized LEXUS dealer's service representative that the blockage was the result of the improper design and materials used and that, had proper materials such as an evaporator hose with an insecticide tip, commonly known as an ARINIX® Tip, been used, the issue would not have occurred. Imaizumi is informed and believes that the ARINIX® Tip part costs approximately $30.

30.    As a result of the Defect, however, Imaizumi has suffered significant ascertainable loss, as he was quoted a price of approximately $7,500 to remedy the

flooded passenger compartment interior water damage caused by the Defect. Although Imaizumi's automobile insurance company covered a portion of the cost, Imaizumi was required to pay approximately $500 as the deductible portion.

31.    Imaizumi regularly saw advertisements for LEXUS vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before he purchased his LEXUS RX SUV in 2020. Had those advertisements or any other LEXUS materials disclosed to Imaizumi that the Class Vehicles had defective AC evaporator drain, or that he would have to pay for repairs/replacement of the AC evaporator drain, he would not have purchased his Class Vehicle, or would have paid substantially less for it.

32.    Defendant Toyota Motor Company

33.    Defendant Toyota Motor Company (hereinafter "TMC") is a Japanese corporation with its principal place of business in Toyota City, Aichi, Japan. [2]

34.    LEXUS is the luxury vehicle division of TMC The LEXUS brand is marketed in more than 90 countries and territories worldwide and is Japan's largest-selling manufacturer of premium cars; it has ranked among the 10 largest Japanese global brands in market value. TMC's LEXUS division is headquartered in Nagoya, Japan and has operational centers in in Brussels, Belgium, and Plano, Texas.[3]

35.    At all relevant times, TMC (itself and through its related entities) engaged in the business of designing, selling, manufacturing, marketing, distributing, servicing and warranting the Class Vehicles.

36.    Upon information and belief, TMC (itself and through its related entities) was responsible for designing and manufacturing the Class Vehicles, including the defective AC evaporator drain, and therefore is an essential party to this action concerning a design defect in the Class Vehicles' AC evaporator drain.

37.    Upon information and belief, TMC has, and at all relevant times had, the

---

[2] https://en.wikipedia.org/wiki/Toyota
[3] https://en.wikipedia.org/wiki/Lexus

contractual right to exercise, and in practice has exercised, control over the design, materials and manufacture of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made, and facts withheld from consumers and the public about the Defect. TMC (itself and through its related entities) has been involved in assisting, directing, and handling of Class Member complaints regarding the Defect.

38.     At all relevant times, TMC acted in the United States and in California by itself and through TMNA and Toyota Sales USA and its other various entities, in the business of designing, engineering, testing, validating, manufacturing, marketing, and selling Toyota and Lexus branded vehicle throughout the United States, including within California. Upon information and belief, TMC ships its vehicles which are manufactured outside of the United States to ports in California, primary the port of Long Beach, California, and from California, TMC (itself and through its related entities) arranges for the distribution of those vehicles throughout the United States.

39.     Plaintiffs refer to TMC, TMNA, and Toyota Sales USA jointly and severally as "Defendants."

40.     At all relevant times, TMC (itself and through its related entities) engaged in the business of designing, selling, manufacturing, marketing, distributing, servicing and warranting Class Vehicles.

41.     TMC's LEXUS division claims it is "committed to creating luxury automobiles which are and will be among the finest ever built anywhere in the world" and that "LEXUS is equally committed to setting a new standard for extraordinary customer satisfaction throughout the ownership cycle."[4]

42.     Upon information and belief, Defendants were responsible for the manufacture, materials, warranty and design of the Class Vehicles, including the defective AC evaporator drain.

43.     Upon information and belief, Defendants, and at all relevant times had,

---

[4] Sec.gov/Archives/edgar/data/1019849/000095012402000556/k66280ex10-24.txt

the contractual right to exercise, and in practice has exercised, control over the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the Defect. LEXUS has been directly involved in assisting, directing, and handling of Class Member complaints regarding the Defect.

44.    TMC maintains an extensive dealer network in and throughout the United States. TMC maintains an extensive dealer network in and throughout this judicial district and the State of California and transports vehicles into the State of California for sale and lease to consumers, such as Plaintiffs and Class Members.

**Defendant Toyota Motor North America, Inc.**

45.    Defendant Toyota Motor North America, Inc. ("TMNA") is a corporation organized under the laws of the State of California. TMNA is a wholly owned subsidiary of TMC and is responsible for the sales and marketing, field inspections, and warranty responsibilities for TMC and its affiliated companies.[5] TMNA is the holding company for the sales, manufacturing, engineering, and research and development subsidiaries of TMC located in the United States. TMNA is in the business of designing, engineering, testing, validating, manufacturing, marketing, and selling TOYOTA and LEXUS branded vehicles throughout the United States, including within the State of California, in which it is incorporated. TMNA is the parent company of Defendant Toyota Sales USA. While TMNA maintains its primary headquarters in Plano, Texas, it maintains substantial portions of its operations in California. A few examples follow:

**A.    *TMNA Research & Development, Gardena, California:*** TMNA's Research & Development, Gardena, is its research & development arm for North America, which is based in Gardena, California. Through TMNA R&D, Gardena,

---

[5] *See* https://www.toyota.com/usa/operations/map/tcal

TMNA is engaged in the engineering design, vehicle evaluation, powertrain development & calibration, regulatory affairs, and alternative powertrain research for both its TOYOTA and LEXUS vehicles manufactured or sold in North America.[6] TMNA maintains its R&D Gardena base of operations at 1630 West 186th Street, Gardena, CA 90248-3807. TMNA is the corporate parent of all relevant Toyota entities, including but not limited to Toyota Motor Manufacturing, Kentucky, Inc.; Toyota Motor Manufacturing, Indiana, Inc.; Toyota Motor Manufacturing Canada Inc.; Toyota Motor Manufacturing Mississippi Inc.; Toyota Motor Manufacturing, Texas, Inc.; Toyota Motor Manufacturing de Baja California; Toyota Financial Services; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; and Toyota Motor Credit Corporation.

*B*.     ***TABC, Inc., California.*** Almost 50 years ago, the Toyota Defendants opened their first manufacturing facility in the United States in Long Beach, California, referred to as the Toyota Auto Body Company ("TABC"). Ever since, TABC has been in the forefront of building the company's reputation for quality. Currently, with 300 team members, TABC is a primary supplier of parts for certain Toyota vehicles and components— everything from sheet metal to steering columns, from catalytic converters to weld sub-assemblies, and more— for use in its manufacturing operations in the U.S. and for export to Japan. TABC maintains its base of operations at 6375 North Paramount Boulevard, Long Beach, CA 90805.[7]

*C*.     ***TMNA's Substantial Multi-Million Dollar Investment in Its Manufacturing Facilities in California.*** Earlier last year, TMNA announced it would invest $27 million on top of the $485 million spent to date to support an increase in TABC's production capabilities. Chris Reynolds, executive vice president, Corporate Resources, TMNA noted "Toyota's roots in California run deep" and "[t]his

---

[6] https://www.toyota.com/usa/operations/map/ttc_gardena
[7] https://pressroom.toyota.com/good-as-gold-tabc-the-can-do-plant-celebrates-50-years-of-success/

investment demonstrates our continued commitment to doing business in the Golden State, investing in our operations across the United States and building where we sell."[8]

**Defendant Toyota Motor Sales, U.S.A., Inc.**

46.     Defendant Toyota Motors Sales, U.S.A., Inc. ("Toyota Sales USA") is a wholly owned subsidiary of TMNA and is incorporated in in the State of California. Although its primary headquarters is located in Plano, Texas, it continues to have substantial operations in California. Upon information and belief, the sales materials disseminated throughout the United States to dealerships is created and designed in California. In addition, California is the state in which TOYOTA and LEXUS vehicles manufactured elsewhere are shipped into the United States and Toyota Sales, USA is integrally involved in the sales and distribution of those imported vehicles and materials from the port of entry to dealerships throughout the United States. In addition, Toyota Sales, USA oversees the sales of TOYOTA and LEXUS products in 49 states through a network of over 1,200 TOYOTA dealers (of whom more than 900 also previously sold SCION vehicles) and over 200 LEXUS dealers. California maintains the greatest number of authorized TOYOTA dealerships of any other state at 172 dealerships.[9] Toyota Sales USA is a wholly owned subsidiary of TMNA, which in turn, is a wholly owned subsidiary of TMC.

47.     Toyota Sales USA, through its LEXUS division, is responsible for the marketing, advertising and sales of the Class Vehicles, including all versions of the brochures, communications with dealers about the Class Vehicles, and the maintenance and service of the Class Vehicles. It is also the warrantor for portions of the limited warranties offered by Defendants against defects in materials or workmanship which apply to all Class Vehicles sold or leased by authorized Toyota dealers in the United

---

[8] https://pressroom.toyota.com/27-million-investment-to-expand-toyotas-long-beach-manufacturing-capabilities/
[9] https://en.wikipedia.org/wiki/Toyota_Motor_Sales,_USA#:~:text=TMS%20oversees%20the%20sales%20of,other%20state%20at%20172%20dealerships.

States and New Jersey and/or Florida, including Plaintiffs' Class Vehicles. That warranty's coverage is automatically transferred at no cost to subsequent vehicle owners.

## PERSONAL JURISDICTION

48.     This Court has personal jurisdiction over Defendants because Defendants TMNA and Toyota Sales USA are incorporated in this State and are authorized to do business in this judicial district and in the State of California, conduct substantial business in the State of California, and some of the material conduct and omissions giving rise to the complaint, took place in California. In addition, each Defendant intentionally avails itself of the markets within California for the promotion, sale, marketing, and distribution of its vehicles, including the Class Vehicles, and conducts a substantial portion of its manufacturing in California and imports its vehicles manufactured elsewhere into the ports of entry located in California for further sale and distribution to its authorized dealership network in the United States, and maintain more authorized dealers in the State of California than any other state. The exercise of jurisdiction would comport with notions of fair play and substantial justice.

49.     Each of these facts independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over the Defendants permissible under traditional notions of fair play and substantial justice.

## APPLICABLE CONTROLLING LAW

50.     Plaintiffs seek damages and equitable relief on behalf of themselves and the Class Members, pursuant to the federal Magnuson-Moss Warranty Act, the New Jersey Consumer Fraud Act, the Florida Unfair and Deceptive Trade Practice Act, and based upon Defendants' common law breaches of warranty and quasicontract.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

51.     Plaintiffs bring this action for themselves and on behalf of the Class Members.

52.     As a result of the Defect, the AC evaporator drain in each of the Class

Vehicles is susceptible to blockages from things such as spider webs and other insect activity. These blockages force condensed water created by operation of the Class Vehicle's air conditioning system to drain into the Class Vehicle's passenger compartment. The accumulation of excessive undrained water can, and in Plaintiffs' cases have damaged material components in the passenger compartment including the seat and carpeting, compromising the comfort, safety and enjoyment of Class Vehicle occupants, including Class Members, and requiring Class Members to pay substantial amounts of money for repairs.

53. In addition, the damp conditions promote the growth of mold in the passenger compartment. The repairs associated with fixing these interior components far exceed the cost associated with installing the appropriate AC evaporator drainage materials.

54. Plaintiffs are informed and believe that a drain hose equipped with an insecticide tip or other appropriate hose design would prevent the drainage of accumulated evaporator water into the Class Vehicle's passenger compartment, thus preventing the damage that the accumulation of water from the drainage causes in the passenger compartment.

55. Defendants knew or should have known that the AC evaporator drain in Class Vehicles was defective and could cause drainage of water into the passenger compartments of Class Vehicles.

56. The initial installation of the proper drainage pipe or informing Class Members about the Defect could have saved countless Class Members time and money spent on repairs associated with the defect. Defendants knew of the Defect prior to sale or lease of Class Vehicles.

57. Prior to the manufacture and sale of the Class Vehicles, Defendants knew of the Defect through sources such as technical service bulletins; field inspections by its personnel; internal review committees, complaints made on public forums and social media by LEXUS vehicle owners; previous recalls; and other internal sources

unavailable to Plaintiffs without discovery.

**Defendants' Technical Service Bulletins Demonstrate Pre-Sale Knowledge of the Defect.**

58.    Defendants' knowledge of the Defect is also evident in Technical Service Bulletins ("TSBs") issued by Defendants concerning the HVAC evaporator drains in TOYOTA and LEXUS vehicles, including Class Vehicles.

59.    For example, on April 28, 2014, Defendants, through Toyota Sales, USA, issued TSB T-SB-0033-14 entitled "HVAC Evaporator drain Hose Clogged Due to Insect Intrusion" to alert dealers that vehicles could "exhibit a condition where the HVAC Evaporator drain Hose has become obstructed with an insect nest. An insect repellent drain hose tip (ARINIX® Tip) is now available to help minimize future occurrences of this environmental condition. For some models, a new drain hose is required to properly fit the ARINIX® Tip." The bulletin indicated that Toyota would not cover the installation of the ARINIX® Tip under warranty.

60.    Then, on May 12, 2014, Defendants through Toyota Sales USA (which listed the TSB as coming from "Lexus, a division of Toyota Motor Sales, U.S.A.") issued a TSB numbered L-SB-0018-14 for LEXUS vehicles, and entitled "HVAC Evaporator drain Hose Clogged Due to Insect Intrusion." ("LEXUS 2014 TSB"). Similar to the earlier TSB for TOYOTA vehicles, the LEXUS 2014 TSB acknowledged that vehicles could experience the signature symptom of the "HVAC Evaporator drain Hose [becoming] obstructed with an insect nest." The LEXUS 2014 TSB advised dealers that "[a]n insect repellent drain hose tip (ARINIX® Tip) is now available to help minimize future occurrences of this environmental condition." Again, the bulletin indicated that the Defendants would not cover the installation of the ARINIX® Tip under warranty.

61.    The Bulletin further instructed service centers that "[f]or some models, a new drain hose is required to properly fit the ARINIX® Tip." The ARNIX® Tip is an insect repellent drain hose tip which costs approximately $30. Figure 1 depicts the

ARINIX® Tip, which appears as a white cap, at the end of the drain hose:



*Figure 1: ARINIX® Tip*

62.    On July 26, 2021, Defendants through Toyota Sales issued TSB L-SB-0024-21 (which listed the TSB as coming from "Lexus, a division of Toyota Motor Sales, U.S.A.") entitled "HVAC Evaporator drain Hose Clogged Due to Insect Intrusion" ("LEXUS 2021 TSB") which added coverage to LEXUS models from model years 2018 through 2022, including Plaintiffs' Class Vehicles, and stated "Applicability has been updated to include 2018 – 2022 model year LEXUS vehicles." Similar to the prior TSBs, the LEXUS 2021 TSB bulletin indicated that the Defendants would not cover the installation of the ARINIX® Tip under warranty.

63.    Incredibly, despite stating that the prior referenced TSBs were intended to "minimize future occurrences of this environmental condition," Defendants neither added the ARINIX® Tip to the Class Vehicles at the factory, nor offered the

ARINIX® Tip as an option for the $30 cost to be installed either at the factory or by the dealer or informed Plaintiffs or Class Members in any materials that the Defect existed and could be easily remedied with a $30 materials component.

**Defendants' Pre-Sale Knowledge of the Defect is also Demonstrated from a Prior Recall by Defendants.**

64.    Defendants also knew or should have known about the Defect from a 2013 recall of 870,000 vehicles with similar or identical insect blockage issues. In October of 2013, Defendants announced a recall for 870,000 2012 and 2013 Camry models of TOYOTA vehicles. The recall was in relation to spider webs that were creating blockages in air conditioning condensers. These blockages were causing air bags to spontaneously deploy among other issues. The prior recall also serves as an admission that the Defect is materials-based and should be the subject of warranty coverage.

65.    The similar nature and large-scale recall which Defendants instituted in 2013 was further evidence of notice to Toyota that the Class Vehicles which suffered from a similar condition, from the same time period, had similar issues.

**Defendants Knew of the Defect Based on Class Member Complaints on Public Online Forums.**

66.    Defendants monitor online bulletin boards and chat rooms of their TOYOTA and LEXUS vehicle owners on a regular and continuous basis in connection with both its social media outreach and in connection with its obligations under the TREADS Act requiring manufacturers to monitor safety issues and inform NHTSA within five (5) days of any safety issues it becomes aware of through that monitoring effort.

67.    In connection with the Defect, many Class Vehicle owners posted complaints about the Defect on public online vehicle owner forums. The following is a small sampling of such complaints:

68.    The following is a small subset of such complaints found on online

forums including Facebook and Club LEXUS[10]

    i.    "My car is just 4 months old . I am getting water inside of it. The dealer on route 10 claims it is because of the sunroof drains getting clogged by the stuff from the tree. One person told me it is from spider web clogging it. The car has been with them for a week they cannot guarantee me it is not going to happen again." User Madbuyer August 2, 2016.

    ii.    "My 2017 RX has water accumulating in the passenger side foot well. I live in the northeast and am dealing with a high volume dealership. I brought the vehicle into service and they informed me that there have been multiple issues (3 in the last 5 weeks). The story I was given by my service consultant was that spiders boro [sic] into the AC drainage plug causing it to clog and backing water up into the cabin. The accumulating water causes black mold to form with explains the odd odor. Their solution is to pull out all carpeting and padding and perform mold remediation." User jrcaputo October 13, 2017.

    iii.    "I have had the same problem with my LEXUS RX 2016. Bought in feb and had huge leak noticed in oct. Dealership has had my car for nearly 6 weeks - gave it back once with carpet still soaked. Says spider web clogged ac duct" User RM0104 November 18, 2016.

    iv.    "I have a RX450H I recently noticed my floor mat on my [driver] and passenger side is wet. Is there anyone in this group that can shed some light why this is happening?" "Thanks everyone for your advice. The problem was the AC drain" Anil Etwaroo July 17, 2023.

    v.    "Has anyone else had any issues with a 2022 RX350 with large amounts of water under the [passengers] carpet? The smell and amount of water is crazy. Dealership said it wasn't covered under warranty and to take it and have it detailed. They noted that a spider had made a nest in some tube!!" Douglas Hare July 15, 2023.

    vi.    "I have an AC drain leak in my 2020 RX 350 on the passenger side floor. Seems to be happening to a lot of people. When I took it to the dealer, they gave me standard response which is, AC drain is clogged by a spider web and not covered under warranty but your will fix it with us!" Hyman Shana September 3, 2022.

    69.    In sum, as early as 2016, and likely earlier, Defendants were aware of the

Defect causing issues for Class members and owners of their TOYOTA and LEXUS

vehicles. In addition, Defendants were aware of the Defect based on, *inter alia*, the

---

[10] https://www.clubLexus.com/forums/rx-4th-gen-2016-2022/869775-water-inside-car-drain-clogged-merged-threads.html last visited August 22, 2023

following sources:

    A.    Technical Service Bulletins evincing knowledge of insects causing drain blockages;

    B.    Knowledge LEXUS had of the large recall of air conditioner condensers due to blockages caused by insects by Toyota; and,

    C.    Numerous and consistent vehicle owner complaints made on online vehicle owner forums.

70.    Moreover, the large number and consistency of Class Member complaints describing the Defect's propensity to cause a moldy odor to emit from the air-conditioning vents underscores the fact that Class Members considered the Defect to be a material issue to the reasonable consumer, particularly as it caused additional and separate physical damage to the vehicle.

71.    Certain Class Members who have raised this issue with the authorized LEXUS dealer's service or general manager have been told that the problem occurs frequently and that Defendants know about the problem and prefer to handle it after the fact as a non-warranty item, rather than incur the cost of fixing the problem preemptively.

**The Applicable Warranties**

72.    Defendants sold Class Vehicles with a new vehicle "Basic Warranty" which included, among other warranties, protections against DEFECTS:

This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by LEXUS. …The warranty is for 48 months or 50,000 miles, whichever occurs first." …Warranty repairs will be made at no charge for parts and labor.

**Defendants' Marketing and Concealment of the Defect**

73.    In addition, Defendants represent that the Parts Warranty "is in effect for 12 months, regardless of mileage … [and] Any repair or replacement that becomes necessary because of a defect in the service part is warrantable."

74.    Both Defendants' New Vehicle Basic Warranty and Parts Warranty cover the AC evaporator drain and Drain Hose, which is the part alleged to be defective,

which causes the passenger compartment flooding and water damages and which suffers from a materials and/or design defect.

75.     Based on Plaintiffs' experiences and reports from other consumers, Defendants have refused to cover repairs related to the Defect under either warranty, and instead requires Class Members pay out-of-pocket for these nonpermanent "fixes" for the Defect even if Class Members' vehicles were covered under the relevant warranty at the time. In addition, even if the failure is covered by the Class Member's automobile insurance, Class Members are responsible for the deductible portion and must pay that out-of-pocket as well as incur the cost of delay and non-use of the vehicle as well as separate and independent physical damage to the vehicle.

76.     Upon information and belief, Defendants knowingly manufactured and sold the Class Vehicles with the Defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' AC evaporator drain and the Defect.

77.     Defendants, particularly Toyota Sales USA and TMNA, directly market the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

78.     Although Defendants knew of the AC evaporator drain's inability to properly drain because they failed to add the ARINIX® Tip protector knowing the AC evaporator drain commonly becomes blocked without the ARINIX® Tip protector added on, they knowingly concealed from Plaintiffs and Class Members this material Defect prior to their respective purchases of their Class Vehicles. This led Plaintiffs and Class Members to form a reasonable belief and expectation that this issue would not emanate from Class Vehicles' AC evaporator drain and certainly caused the reasonable consumer not to expect that the vehicle itself would become flooded and physically damaged, resulting in the growth of organic materials regularly giving rise to foul odors, making the use of Class Vehicles anything but marketable.

79.     Plaintiffs and Class Members were exposed to the long-term, national, multimedia marketing campaign of Defendants, particularly TMNA and Toyota Sales USA, touting the supposed high quality and marketability of the Class Vehicles, and Class Members justifiably made their decisions to purchase and/or lease their Class Vehicles based on said Defendants' misleading marketing that concealed the true defective nature of the Class Vehicles' Defect.

80.     Further, Defendants knowingly misled Class Members about the true defective nature of the Class Vehicles. As detailed above, Defendants have been aware of the Defect since at least 2014, and likely earlier, through technical service bulletins, the high number of AC evaporator drain servicing and replacement component part sales, and the numerous and consistent complaints about the Defect made and posted in public online forums.

81.     In sum, Defendants have actively concealed the existence and nature of the Defect from Class Members since at least 2014 despite their knowledge of the existence and pervasiveness of the Defect, and certainly well before Plaintiffs and Class Members purchased or leased their respective Class Vehicles. Specifically, Defendants have:

A.    Knowingly concealed from Class members, prior to, at and after the time of purchase, lease, and/or service, of the Class Vehicles, the presence and existence of the Defect;

B.    Knowingly concealed from Class Members prior to, at and after the time of purchase, lease, and/or service, that the Class Vehicles' AC evaporator drain was defective and was not fit for its intended purposes;

C.    Knowingly concealed the fact that the Class Vehicles' AC evaporator drain was defective, despite the fact that Defendants learned of the AC Defect as early as 2014, based on the multiple TSBs to the dealerships issued by Defendants TMNA and Toyota Sales USA and likely even earlier;

D.    Knowingly concealed the existence and pervasiveness of the Defect even when directly asked about it by Class Members during communications with LEXUS Customer Assistance, LEXUS dealerships, and LEXUS service centers;

E.    Actively concealed the Defect by forcing Class Members to bear the cost of repairs;

F.    Actively concealed the Defect by knowingly omitting to reveal that a preventative material replacement, e.g., the ARNIX® Tip protector for the AC evaporator drain existed and could have been installed to thereby prevent the blockages from occurring and reoccurring because the AC evaporator drain hose otherwise remained defectively designed and lacking in the proper and necessary material installation.

82.    By engaging in the conduct described above, Defendants concealed, and continue to conceal, the Defect from Class Members. Plaintiffs and all Class members have been injured because, if Class Members had knowledge of the information Defendants concealed, they would not have bought or leased the Class Vehicles or would have paid less for them.

**Fraudulent Concealment Allegations**

83.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals related to Defendants responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. Defendants are necessarily in possession of or have access to all of this information. Plaintiffs' claims arise out of Defendants' fraudulent concealment of the Defect. Plaintiffs and Class Members allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, Defendants knew, or were reckless in not knowing, of the Defect; Defendants were under a duty to disclose the Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it.

Defendants failed to disclose the Defect to the Plaintiffs and Class Members or the public at any time or place or in any manner.

84.    Plaintiffs and Class Members herein make the following specific fraud allegations with as much specificity as possible although they do not have access to information necessarily available only to Defendants:

a.    **Who**: Defendants actively concealed the Defect from Plaintiffs and Class Members while simultaneously touting the comfort and quality of the Class Vehicles, as alleged above. Plaintiffs and Class Members are unaware of, and therefore unable to identify, the true names and identities of those specific individuals related to Defendants who are responsible for such decisions, as alleged above.

b.    **What**: Defendants knew that the Class Vehicles contained the AC evaporator drain Defect. LEXUS concealed the Defect and made contrary representations about the comfort, and quality of the Class Vehicles, as specified above in paragraphs above.

c.    **When**: Defendants concealed material information regarding the Defect at all times and made representations about the quality of the Class Vehicles, starting no later than 2014, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged above in paragraphs above. Defendants have never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their Class Vehicles to LEXUS complaining of the defect, the dealers only then conceded that Defendants were aware of the Defect but denied any responsibility for bearing the cost of the AC evaporator drain Defect.

d.    **Where**: Defendants concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and

Class Members and made contrary representations about the quality of the
Class Vehicles. Such information is not adequately disclosed in any sales
documents, displays, advertisements, warranties, owner's manual, or on
Defendants' website.

e.     **How**: Defendants concealed the Defect from Plaintiffs and Class
Members and made representations about the quality of the Class
Vehicles. Defendants actively concealed the truth about the existence and
nature of the Defect from Plaintiffs and Class Members at all times, even
though they knew about the Defect and knew that information about the
Defect would be important to a reasonable consumer and Defendants
promised in their marketing materials that Class Vehicles have qualities
that they do not possess.

f.     **Why**: Defendants actively concealed material information about the
Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class
Members to purchase or lease Class Vehicles, rather than purchasing or
leasing competitors' vehicles and made representations about the world-
class quality of the Class Vehicles. Had Defendants disclosed the truth,
for example in its advertisements or other materials or communications,
Plaintiffs (and reasonable consumers) would have been aware of it, and
would not have bought Class Vehicles or would have paid less for them.
In addition, Defendants' dealerships revealed to certain class members
that the Defendants were well aware of the defect but preferred to address
it only after it materialized, and the passenger compartments of vehicles
were flooded because it was cheaper for Defendants to handle it that way
and pass the cost and aggravation onto the Class Members.

## TOLLING OF THE STATUTES OF LIMITATIONS

**Fraudulent Concealment Tolling**

85.     Upon information and belief, Defendants have known of the Defect in the

Class Vehicles since at least 2014, and concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiffs and Class Members during communications with Defendants, LEXUS Customer Assistance, LEXUS dealerships, and LEXUS service centers. Defendants continue to conceal the Defect to this day.

86. Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**Estoppel**

87. Defendants were and are under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. Defendants actively concealed – and continue to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the quality of the Class Vehicles. Plaintiffs and Class Members reasonably relied upon Defendants' knowing and affirmative representations and/or active concealment of these facts as alleged herein. Based on the foregoing, Defendants are estopped from relying on any statute of limitation in defense of this action.

**Discovery Rule**

88. The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Defect.

89. In the case of Plaintiff Hadi, that occurred in or about July, 2023, when her interior passenger compartment flooded and she brought her Class Vehicle in for an appointment at an authorized LEXUS dealer, at which point she was given the diagnosis of an insect blockage and given the estimate of approximately $8,000 to repair the interior.

90. In the case of Plaintiff Imaizumi that occurred in or about September, 2023 when his interior passenger compartment flooded and he brought the Class Vehicle in for an appointment at the dealer, at which point he was given the diagnosis

of an approximately $8,000 to repair the passenger compartment.

91.    In fact, Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest–after the Defect caused their passenger compartments to fill with water and cause separate physical damage to the vehicle. Even then, Plaintiffs and Class Members had no reason to know the water in their passenger compartment was caused by a defect in the Class Vehicles because of Defendants' active concealment of the Defect. Thus, Plaintiffs and Class Members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing their passenger compartments to become flooded.

<strong>CLASS ACTION ALLEGATIONS</strong>

92.    Plaintiffs initiate this lawsuit as a class action on behalf of themselves and all other similarly situated individuals pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4). Plaintiffs allege that the within action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Plaintiffs assert this class action on behalf of themselves and all other similarly situated members of the proposed class (the "Class") and Statewide Subclasses, defined as follows:

**Nationwide Class:**

All purchasers or lessees of Class Vehicles who purchased a Class Vehicle in the United States and its territories and possessions

**New Jersey Subclass:**

All purchasers or lessees of Class Vehicles who purchased a  Class Vehicle in the State of New Jersey

**Florida Subclass:**

All purchasers or lessees of Class Vehicles who purchased a  Class Vehicle in the State of Florida

52.    "Class Vehicles" are defined as a vehicle of any of the following

models/model years, 2015-2022:

> LEXUS CT 200h,
> LEXUS Es 350,
> LEXUS Es 300h,
> LEXUS GX 460,
> LEXUS HS 250h, LFA,
> LEXUS LS 460, LS 600hL,
> LEXUS RX 350/450h,
> LEXUS RX 350 (NAP).

93.    Excluded from the Class are: (1) Defendants, and any entity or division in which Defendants or any of them have a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) claims for personal injuries resulting from the facts alleged herein. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

**Numerosity**

94.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is in the tens of thousands or hundreds of thousands, upon information and belief, such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in LEXUS's possession, custody, or control, as well as from records kept by individual state motor vehicle departments.

**Typicality**

95.    The claims of Plaintiffs are typical of the claims of Class Members in that the Plaintiffs, like all Class Members, purchased and/or leased a Class Vehicle designed, and manufactured by Defendants, particularly TMC, and distributed and sold by Defendants, particularly, TMNA and Toyota Sales USA. Plaintiffs, like all Class Members, have been damaged by the misconduct of TMNA, Toyota Sales USA and TMC in that they have purchased a vehicle they would not have purchased, or for

which they would have paid less, and incurred or will incur the cost of service and repair relating to and caused by the Defect. Furthermore, the factual bases of Defendants' misconduct are common to the Plaintiffs and all Class Members and represent a common thread of misconduct resulting in injury to the Plaintiffs and all Class Members.

**Adequate Representation**

96.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective automotive vehicles.

97.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**Predominance of Common Issues**

98.    There are numerous questions of law and fact common to Plaintiffs and Class Members, the answers to which will advance resolution of the litigation as to all Class Members, and which predominate over any individual question. These common legal and factual issues include:

A.    whether the AC evaporator drain in the Class Vehicles is defective;

B.    whether Defendants knew or should have known about the AC evaporator drain Defect, and, if so, how long Defendants knew or should have known of the Defect;

C.    whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

D.    whether Defendants had and/or have a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

E.    whether Defendants omitted and failed to disclose material facts about

Class Vehicles;

F.   whether Defendants' concealment of the true defective nature of Class
     Vehicles induced Plaintiffs and Class Members to act to their detriment
     by purchasing Class Vehicles;

G.   whether Defendants represented, through their words and conduct, that
     Class Vehicles had characteristics, uses, or benefits that they did not
     actually have, in violation of New Jersey's Consumer Fraud Act
     ("NJCFA") and Florida Unfair and Deceptive Trade Practices Act
     ("FDUTPA");

H.   whether Defendants represented, through their words and conduct, that the
     Class Vehicles were of a particular standard, quality, or grade when they
     were of another, in violation of NJCFA and FDUTPA;

I.   whether Defendants advertised the Class Vehicles with the intent not to
     sell them as advertised, in violation of NJCFA and FDUTPA;

J.   whether Defendants' affirmative misrepresentations about the true
     defective nature of the Class Vehicles were likely to create confusion or
     misunderstanding, and therefore fraudulent, within the meaning of the
     NJCFA and FDUTPA.

K.   whether Defendants' affirmative misrepresentations about the true
     defective nature of the Class Vehicles were and are deceptive within the
     meaning of the NJCFA and FDUTPA.

L.   whether the Class Vehicles were unfit for the ordinary purposes for which
     they were used, in violation of the implied warranty of merchantability;

M.   whether Plaintiffs and the other Class Members are entitled to a
     declaratory judgment stating that the AC evaporator drain in Class
     Vehicles are defective and/or not merchantable;

N.   whether Plaintiffs and Class Members are entitled to equitable relief,
     including, but not basic to, a preliminary and/or permanent injunction;

O.    whether Defendants should be declared financially responsible for notifying Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the AC evaporator drain Defect in the Class Vehicles; and,

P.    whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, service, repair, or replace the defective AC evaporator drain.

**Superiority**

99.    Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

100.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

101.    Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

<u>**FIRST CLAIM FOR RELIEF**</u>

**Breach of Express Warranty**

**(On Behalf of Plaintiffs and the Nationwide Class**

**Against All Defendants)**

102.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1 through 101, inclusive.

103.    Defendants are and were at all relevant times a "merchant" with respect to motor vehicles, and specifically the Class Vehicles, under, inter alia UCC § § 2-104(1), and "sellers" of motor vehicles, and specifically the Class Vehicles, under, inter alia, UCC § 2-103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of motor vehicles, and specifically the Class Vehicles, under, inter alia, UCC § 2a-103(1).

104.    The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, UCC § 2-105(1).

105.    Plaintiffs and Class Members bought, or leased Class Vehicles manufactured, marketed to them, and intended to be purchased by consumers such as them, by Defendants.

106.    Defendants, particularly TMNA, Toyota Sales USA and their LEXUS division, expressly warranted the Class Vehicles against defects including the Defect, as described above, within the meaning of, inter alia, UCC § 2-313(1).

107.    Defendants' express warranties formed a basis of the bargain reached when Class Members purchased or leased their Class Vehicles.

108.    As described above, the AC evaporator drain in the Class Vehicles is defective. The Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

109.    Defendants knew of the Defect, and that this Defect poses serious safety risks in the form of mold spore ingestion and water damaging crucial electrical components to consumers like Plaintiffs and Class Members. Defendants wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiffs and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

110.    Specifically, Class Vehicles were sold to Plaintiffs and Class Members with a new vehicle 48-month and 50,000-mile express warranty.

111.   Pursuant to the Class Vehicles' Service and Warranty Booklet, LEXUS warranted to the original and each subsequent owner that they "will make any repairs or replacements necessary, to correct defects in materials and workmanship arising under the warranty period."

112.   Defendants breached their express warranties by knowingly supplying the Class Vehicles to Plaintiffs and Class Members with defective materials in the form of the defective AC evaporator drain and by failing to include a necessary material, e.g., the protective component in the form of the ARINIX Tip which is intended to protect against and remediate the very defect existing here, as was known to Defendants based on their TSBs issued prior to Plaintiffs' Class Vehicles purchase.

113.   Defendants are obligated, under the terms of its express warranties, to perform repairs and/or provide replacement components to permanently correct the Defect for Plaintiffs and Class Members.

114.   As described herein, Defendants were provided with appropriate notice and have been on notice of the Defect and of its breach of express written warranties from various sources.

115.   The Class Vehicles were under this express warranty when they exhibited the Defect.

116.   Plaintiffs gave Defendants a reasonable opportunity to cure its failures with respect to its warranties, and Defendants failed to do so free of charge or at all.

117.   Defendants breached their express warranties by failing to permanently repair the Class Vehicles and by failing to provide to Plaintiffs or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it expressly warranted when it sold the Class Vehicles to Plaintiffs and Class Members.

118.   In addition, affording Defendants any further reasonable opportunity to cure their breach of written warranties is unnecessary and futile here. When Plaintiffs and other Class Members provided such notice and sought relief under the warranty, Defendants refused to do so and charged them for the repair and replacement of the

defective materials.

119.   To the extent any express warranties do not by their terms cover the defects alleged in this complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiffs and Class Members whole, the warranties fail of their essential purpose and, accordingly, recovery by Plaintiffs and Class Members are not restricted to the promises in any written warranties, and they seek all remedies that may be allowed.

120.   Any attempt by Defendants to limit or disclaim the express warranties in a manner that would exclude coverage of the Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by Defendants' concealment of material facts. Thus, any such effort by Defendants to disclaim, or otherwise limit, its liability for the Defect is null and void.

121.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including out-of-pocket costs and the costs of needed present and future repairs, in an amount to be determined at trial, and are entitled to the relief requested below.

## SECOND CLAIM FOR RELIEF

### Breach of Express Warranty–Magnuson-Moss Warranty Act
### (On Behalf of Plaintiffs and the Nationwide Class
### Against All Defendants)

122.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1 through 101, inclusive.

123.   The Class Vehicles are consumer products as defined in 15 U.S.C. § 2301(1).

124.   Plaintiffs and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

125.   Defendants are suppliers and warrantors as defined in 15 U.S.C. §§ 2301(4) and (5).

126.   Defendants provided Plaintiffs and Class Members with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

127.   Defendants breached the express warranty by refusing to honor the express warranty to replace or repair, free of charge, any defective vehicle component, including defects within the climate control system, which incorporates the AC evaporator drain.

128.   At the time Class Vehicles were sold, Defendants knew of the defects Class Vehicles possessed and offered an express warranty with no intention of honoring said warranty with respect to the known defects.

129.   Additionally, pursuant to 15 U.S.C. § 2304(d)(1), "the warrantor may not assess the consumer for any costs the warrantor or her representatives incur in connection with the required remedy of a warranted product . . . [I]f any incidental expenses are incurred because the remedy is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the consumer as a condition of securing remedy, then the consumer shall be entitled to recover reasonable incidental expenses which are so incurred in any action against the warrantor."

130.   At no time have Defendants offered at their expense a permanent or adequate repair or replacement of the defective AC evaporator drain that would permanently prevent the drainage issues from recurring. Despite repeated demands by Plaintiffs and Class Members that Defendants pay for the materials, labor costs and incidental expenses associated with permanently repairing or replacing the defective AC evaporator drain, Defendants have refused to do so. Defendants' refusal to provide an adequate repair or replacement and to pay for their installation violates 15 U.S.C. § 2304(d)(1).

131.   Defendants were afforded a reasonable opportunity to cure their breach of the Express Warranty, but failed to do so.

132.   As a direct and proximate result of Defendants' breach of their express written warranties, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### Breach of Implied Warranty

### (On Behalf of Plaintiffs and the Nationwide Class

### Against All Defendants)

133.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1 through 101, inclusive.

134.   When Defendants sold the Class Vehicles, Defendants extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which such goods were sold.

135.   Persons who purchased a Class Vehicle from Defendants are entitled to the benefit of their bargain: a vehicle with a non-defective AC evaporator drain that properly drains water and does not allow AC condensation to drain into the passenger compartment.

136.   Defendants breached this implied warranty in that its Class Vehicles are: (1) not fit for ordinary use; and, (2) not of a merchantable quality.

137.   Had the fact that the Defect existed been disclosed at the time of sale, the Class Vehicles could not have been sold, or could not have been sold at the same price.

138.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### Breach of Implied Warranty – Magnuson-Moss Warranty Act

### (On Behalf of Plaintiffs and the Nationwide Class

### Against All Defendants)

139.   Plaintiffs incorporate by reference each allegation set forth in paragraphs

1 through 101, inclusive.

140.   Plaintiffs and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

141.   Defendant LEXUS is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

142.   Defendants Toyota and Toyota Sales are supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

143.   The subject Class Vehicles are consumer products as defined in 15 U.S.C. § 2301(1).

144.   Defendants extended an implied warranty to Plaintiffs and Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers defects in its Class Vehicles and Class Vehicle AC evaporator drains.

145.   Defendants breached this implied warranty by selling its Class Vehicles with defective AC evaporator drains that were neither merchantable nor fit for their intended purpose.

146.   Defendants extended an implied warranty to Plaintiffs and Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers defects in the subject Class Vehicles' AC evaporator drains.

147.   Defendants breached this implied warranty by selling Class Vehicles that were neither merchantable nor fit for their intended purpose.

148.   As a direct and proximate result of Defendants' breach of the implied warranty under the Magnuson-Moss Act, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### Violations of NJCFA

### (On Behalf of Plaintiff Hadi and the New Jersey Subclass

### Against All Defendants)

149.   Plaintiffs incorporate by reference each allegation set forth in paragraphs

1 through 101, inclusive.

    53.    The NJCFA states in pertinent part as follows:

> The act, use or employment by any person of any
> unconscionable commercial practice, deception, fraud, false
> pretense, false promise, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact
> with intent that others rely upon such concealment,
> suppression or omission, in connection with the sale or
> advertisement of any merchandise or real estate, or with the
> subsequent performance of such person as aforesaid, whether
> or not any person has in fact been misled, deceived or
> damaged thereby, is declared to be an unlawful practice . . . .

N.J.S.A. § 56:8-2.

    150.    Defendants are each a "person" as defined by the NJCFA. N.J.S.A. § 56:8-1(d).

    151.    The purchase or lease of Class Vehicles by Plaintiffs and Class Members constituted "merchandise" as defined by the NJCFA. N.J.S.A. § 56:8-1 and § 56:8-2.

    152.    By knowingly concealing the defective nature of the Class Vehicles to Plaintiffs and Class Members, Defendants, particularly, TMNA and Toyota Sales USA, violated the NJCFA, because such information was a material fact that a reasonable consumer would want to know.

    153.    In addition, Defendants represented that the Class Vehicles had characteristics and benefits that they do not possess, and represented that the Class Vehicles were of the highest standard, quality, or grade for a luxury vehicle when they were of another.

    154.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

    155.    Defendants knew, by 2014 at the latest, and certainly before the sale or lease of the Class Vehicles, that Class Vehicles' AC evaporator drain suffered from an inherent defect, would exhibit problems such water drainage into the passenger

compartment of Class Vehicles, and were not suitable for their intended use.

156.    By 2014 at the latest, Defendants had exclusive knowledge of material facts concerning the existence of the Defect in its Class Vehicles. Yet, Defendants actively concealed this Defect from consumers at and prior to the time of purchase and failed to offer Class Members a permanent solution to the Defect.

157.    Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the AC evaporator drain, as well as the associated costs that would have to be expended in order to repair or replace the Class Vehicles interior carpeting and seating due to the Defect and the resulting additional and separate physical damage to the vehicle it caused.

158.    Defendants were in a superior position to know the true state of facts about the Defect in the Class Vehicles;

159.    Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the Defect until, at the earliest, the first instance of the issue occurring.

160.    Defendants knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Defect prior to its manifestation.

161.    Defendants knew or should have known that their conduct violated the NJCFA.

162.    In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause and remedy of the noxious foul odor, Defendants knowingly and intentionally concealed material facts and breached their duty to not do so.

163.    The facts Defendants concealed from Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Defect to be an undesirable quality, as Plaintiffs and Class Members did. If Plaintiffs and Class Members known that the Class Vehicles

had the Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for them.

164.   Plaintiffs and Class Members, like all objectively reasonable consumers, did not expect the AC evaporator drain to drain water into their passenger compartments and cause damage to carpets and seats.

165.   As a result of Defendants' misconduct, Plaintiffs and Class Members have been harmed and suffered actual damages including that Plaintiffs and Class members would not have purchased their vehicles for the price paid, or would not have purchased them at all had they know of the material defect and as a result, paid an unconscionable, illegal and improper price premium which they would not have paid.

166.   In addition, as a result of Defendants' misconduct, Plaintiffs and Class Members have been harmed and suffered actual damages including that Class Vehicles experienced these blockages causing the draining of water into the passenger compartment due to the Defect, causing inconvenience, creating an uncomfortable environment for Vehicle occupants, and causing Plaintiffs and Class Members to expend significant money to repair issues caused by the Defect.

167.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer ascertainable losses in that they have experienced and may continue to experience their Class Vehicles' AC evaporator drain failing, resulting in flooding into the passenger compartment of the vehicle causing physical damage, and for which they must pay out-of-pocket.

168.   Defendants' violations present a continuing risk to Plaintiffs and to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

169.   Plaintiffs and Class Members are entitled to equitable relief.

170.   Thus, pursuant to N.J.S.A. § 56:8-2, Plaintiffs seek, in addition to equitable relief, actual and statutory damages, attorneys' fees and expenses, treble

damages, and punitive damages as permitted under the NJCFA and applicable law.

### SIXTH CLAIM FOR RELIEF

**Violations of FDUTPA**

**(On Behalf of Plaintiff Imaizumi and the Florida Subclass**

**Against All Defendants)**

171.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1 through 101, inclusive.

172.    Plaintiff Imaizumi brings this action against Defendants on behalf of himself and the Florida Subclass.

173.    Plaintiff Imaizumi is a consumer within the meaning of FDUTPA, Fla. Stat. § 501.203(7).

174.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

175.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA, as described herein.

176.    In the course of their business, and as set forth in this complaint, Defendants enticed consumers to purchase the Class Vehicles in their defective state, without advising Plaintiff Imaizumi or members of the Florida Subclass of the Defect. After accepting Plaintiff Imaizumi's and Florida Subclass members' money, and after receiving numerous complaints and repair requests, Defendants still have yet to call for a recall or reimburse Plaintiff Imaizumi and Florida Subclass members for their defective AC evaporator drain.

177.    Defendants thus violated the FDUPTA by, at a minimum employing deception, deceptive acts or practices, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

178.    Defendants engaged in misleading, false, unfair or deceptive acts or
practices that violated FDUTPA by marketing the Class Vehicles but failing to ensure
that consumers actually received non-defective Class Vehicles.

179.    Defendants' unfair and deceptive acts or practices were likely to and did
in fact deceive reasonable consumers, including Plaintiff Imaizumi and the Florida
Subclass.

180.    Plaintiff Imaizumi and members of the Florida Subclass suffered
ascertainable loss and actual damages as a direct and proximate result of Defendants'
misrepresentations. Plaintiff Imaizumi and the Florida Subclass would not have
purchased the Class Vehicle, or alternatively, would have purchased the Class Vehicle
at a discounted price, had they been aware of Defendants' unfair and deceptive acts or
practice relating to the defective AC evaporator drain and as a result, paid an
unconscionable, illegal and improper price premium which they would not have paid.

181.    Plaintiff Imaizumi and Florida Subclass members are at risk of irreparable
injury as a result of Defendants' acts and omissions in violation of FDUTPA, which
violations present a continuing risk to Plaintiff Imaizumi and the Florida Subclass.

182.    As a direct and proximate result of Defendants' violations of FDUTPA,
Plaintiff Imaizumi and members of the Florida Subclass have suffered injury-in-fact
and/or actual damage, to be further determined at trial, including but not limited to
diminution of value and the cost of repair including the damage caused by the defect.

183.    Plaintiff Imaizumi and the Florida Subclass are entitled to recover their
actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat.
§ 501.2105(1).

184.    Plaintiff Imaizumi also seeks an order enjoining Defendants' unfair,
unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other
just and proper relief available under FDUTPA.

## SEVENTH CLAIM FOR RELIEF

### Fraud by Concealment

### (On Behalf of All Plaintiffs and the Nationwide Class

### Against All Defendants)

185.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1 through 101, inclusive.

186.   Defendants concealed and suppressed material facts concerning the quality of the Class Vehicles.

187.   Defendants concealed and suppressed material facts concerning the quality of the AC evaporator drain in the Class Vehicles.

188.   Defendants concealed and suppressed material facts concerning the serious Defect causing Class Vehicles' AC evaporator drain to be more susceptible to blockages, which would cause water to drain into passenger compartments.

189.   Defendants knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the vehicles. Defendants furthered and relied upon this lack of disclosure to further promote payments for the additional damage caused by the defect to passenger compartment including carpets and seats – all the while concealing the true nature of the Defect from Plaintiffs and Class Members. Defendants further denied the very existence the Defect and the propensity of blockages when Plaintiffs and Class Members complained of the Defect.

190.   Defendants concealed and suppressed material facts that point to the nature of the Defect. In reality, an ARINIX® Tip (connector, water hose), as admitted by Defendants in their various TSBs to dealers, would remedy the Defect and protect against the AC Evaporator drain causing flooding and physical damage to the vehicle. Without this fix, the water damage caused by the Defect in the passenger compartment far exceeded the costs associated with the ARINIX® Tip.

191.   Defendants committed the foregoing acts and omissions in order to boost

confidence in its vehicles and falsely assure purchasers and lessees of LEXUS vehicles, that the Class Vehicles were comfortable, warranted and reliable vehicles and concealed the information in order to prevent harm to LEXUS and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase or lease the Class Vehicles and because the failure of the AC evaporator drain to act in the manner intended and fail, caused separate and independent physical damage to the vehicle.

192.    Defendants had and have a duty to disclose the Defect in the Class Vehicles because they were known and/or accessible only to Defendants. Defendants had superior knowledge and access to the facts and Defendants knew the facts were not known to, or reasonably discoverable, by Plaintiffs and Class Members.

193.    Defendants also had a duty to disclose because they made affirmative representations about the superior quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, comfort, and usability. Even when faced with complaints regarding the Defect, Defendants misled and concealed the true cause of the symptoms complained of.

194.    As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase/lease and again when they complained of damage associated with the Defect.

195.    The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

196.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, avoid recalls that would hurt the brand's image and cost money, and did so at the expense of Plaintiffs and Class Members.

197.   On information and belief, Defendants have still not made full and adequate disclosure and continue to defraud Plaintiffs and Class Members and conceal material information regarding the Defect that exists in the Class Vehicles.

198.   Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, i.e., they would not have purchased or leased Class Vehicles, or would have paid less for them. Plaintiffs and Class Members' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

199.   Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not commensurate of the Defect that Defendants failed to disclose and paid for temporary measures and replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

200.   Accordingly, Defendants were liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

201.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and Class Members' rights and well-being to enrich themselves and save themselves the costs of repair both preemptively and post-damage. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

# EIGHTH CLAIM FOR RELIEF

## Quasicontract

### (On Behalf of All Plaintiffs and the Nationwide Class

### Against All Defendants)

202.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1 through 101, inclusive.

203.   Defendants have been unjustly enriched by the Plaintiffs and Class Members through Plaintiffs' and Class Members' purchasing and/or leasing Class Vehicles from Defendants and purchasing replacement parts and service from LEXUS that Plaintiffs and Class Members would not have purchased but for the Defect and Defendants' concealment of the same.

204.   Plaintiffs and Class Members unknowingly conferred a benefit on Defendants of which Defendants had knowledge, since Defendants were aware of the defective nature of its Class Vehicles' AC evaporator drain and the resultant moldy odor and other problems described herein, but failed to disclose their knowledge and misled Plaintiffs and the Class Members regarding the nature and quality of the subject Class Vehicles while profiting from this deception.

205.   The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Defendants to retain the benefit of revenue that it unfairly obtained from Plaintiffs and Class Members. Their revenue include the premium price Plaintiffs and the Class paid for the Class Vehicles and the cost of the parts and service bought from Defendants used to repair the flooded passenger compartments alleviate the moldy odor caused by the defective AC evaporator drain.

206.   Plaintiffs and the other members of the Class, having been damaged by Defendants' conduct, are entitled to recover or recoup damages as a result of the unjust enrichment of Defendants to their detriment.

# PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves, and all others similarly situated, request the

Court to enter judgment against Defendants, as follows:

      i.     an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiffs as named representative of the Class, and designating the undersigned as Class Counsel;

     ii.    a declaration that the AC evaporator drain in Class Vehicles have a Defect that results in the creation of water damage and mold into the Vehicle's passenger compartment, and that this Defect requires disclosure;

   iii.    a declaration that Defendants must, at their own expense, notify owners and lessees of Class Vehicles of the Defect;

   iv.    a declaration that any limitation on the Class Vehicles' warranty that would avoid responsibility for the Defect is void;

    v.    an ordering enjoining Defendants, upon a Class Member's request, to pay the cost of inspection to determine whether the Defect is manifest, with any coverage disputes adjudicated by a special master.

   vi.    an order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and to permanently repair the Class Vehicles so that they no longer possess the AC Defect;

  vii.    an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

 viii.    an order requiring Defendants to disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten revenue it received from the sale or lease of the Class Vehicles, or make full restitution thereof to Plaintiffs and Class Members;

   ix.    an award of attorneys' fees and costs, as allowed by law;

    x.    an award of pre-judgment and post-judgment interest, as provided by law;

   xi.    leave to amend this complaint to conform to the evidence produced at trial; and

xii.        such other relief as may be appropriate under the circumstances.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury on all counts and issues.

Dated: November 13, 2023                    Respectfully submitted,

_/s/ S. Martin Keleti_
S. Martin Keleti (Bar #144208)
KELETI LAW
9903 Santa Monica Boulevard, Suite 751
Beverly Hills, California 90212-1671
Telephone: 323.308.8489
E-mail: s.martin.keleti@gmail.com

Gary S. Graifman*
**KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, New Jersey 07645
Telephone: 201.391.7000
E-mail: ggraifman@kgglaw.com

Thomas P. Sobran*
**THOMAS P. SOBRAN, P.C.**
7 Evergreen Lane
Hingham, Massachusetts 02043
Telephone: 781.741.6075
E-mail: tsobran@sobranlaw.com

*_pro hac vice_ application forthcoming